**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| AMERGIN RAIL 2023-1, LLC | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.  2:25-cv-00568 |
| | ) | |
| INDIANA HARBOR BELT RAILROAD COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR BREACH OF CONTRACT FOR LEASE OF RAIL CARS, EQUITABLE ESTOPPEL, IN THE ALTERNATIVE TO BREACH OF CONTRACT UNJUST ENRICHMENT, INTENTIONAL MISREPRESENTATION, BREACH OF STATUTORY DUTIES IMPOSED UNDER ARTICLE 2A OF THE UCC, and CONVERSION**

NOW COMES Plaintiff, Amergin Rail 2023-1, LLC ("**Plaintiff," "Amergin Rail 2023-1," or "Lessor"**) by and through its counsel, and for its Complaint for Breach of Contract for Lease of Rail Cars, Equitable Estoppel, In the Alternative to Breach of Contract Unjust Enrichment, Intentional Misrepresentation, Breach of Statutory Duties Imposed Under Article 2A of the Uniform Commercial Code, and Conversion against Indiana Harbor Belt Railroad Company (**"Defendant," "Railroad" or "Lessee"**) states as follows:

**INTRODUCTION**

Plaintiff leased certain fifty-two rail cars (each individually a "**Car**" and collectively the "**Cars**") to Lessee. Lessee defaulted under the Lease (as described in more detail below) by *inter alia*: (i) failing to return any of the Cars on time, (ii) failing to pay rent when due, (iii) failing to return any of the Cars in the condition required by the terms of the Lease and (iv) scrapping four of the fifty-two Cars (the "**Scrapped Cars**") without Lessor's consent and over Lessor's repeated objections against the scrapping of the Cars.

Rent on the Cars continued to accrue under the Lease even after the Cars were delivered by Lessee to repair shops because, *inter alia*, the Cars were not in the condition required by the Lease and the Cars could not be rented to a new lessee until substantial repairs to the Cars were made.

In addition to defaulting under the Lease, Lessee falsely certified in a Notice and Acknowledgment of Assignment dated June 8, 2023, that Lessee was complying with Lessee's contractual Lease obligations and was not in default. But for Lessee's false certifications, Lessor would not have purchased the Cars, or the price paid by Lessor for the Cars would have been lower.

The monies due for repair, refurbishment, unpaid rentals, freight, storage and the cost for replacement of the Scrapped Cars are not less than $1,500,000.00, plus prejudgment interest of 5% per annum, pursuant to 815 ILCS 205/2.

## THE PARTIES

1.      Amergin Rail 2023-1 is a Delaware limited liability company with the following members who have the following citizenship: a) AAM Series, LLC, Series 1.1 Rail and Domestic Intermodal Assets Holding Company is a Delaware limited liability company and is the sole member of Amergin Rail 2023-1; b) AAM Series 1.1 Rail and Domestic Intermodal Feeder, LLC is a Delaware limited liability company and is the sole member of AAM Series, LLC, Series 1.1 Rail and Domestic Intermodal Assets Holding Company; c) four Delaware limited liability companies are the members of AAM Series 1.1 Rail and Domestic Intermodal Feeder, LLC; and d) each of the such four limited liability companies are owned by one Delaware corporation.  All such companies have a principal place of business in New York.

2.      Amergin Rail 2023-1 is the owner and lessor under the Lease of the fifty-two Cars that are the subject matter of this Complaint.

3.      Non-party Amergin Asset Management, LLC, a Delaware limited liability company, acted as the servicer for the Cars under the Lease since the Cars were acquired by Plaintiff on July 31, 2023 and continues to act as servicer under the Lease (as defined below).

4.      Railroad is an Indiana Corporation with its principal place of business at 2721 161st Street, Hammond, Indiana.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different States.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within this judicial district.

## FACT BACKGROUND

7.      On or about June 23, 1988, Railroad entered into Car Leasing Agreement 4223-83 (the "**Master Lease**") with non-party General Electric Railcar Services Corporation (referred to in the Master Lease as "GERSCO"). See **Exhibit A**. (The "**Lease**" refers to the Master Lease plus all lease riders, amendments, notices and acknowledgments and any other document given in connection therewith.)

8.      On or about May 12, 2004, Railroad entered into Rider No. 11 to the Master Lease. See **Exhibit B**.

3

9.      On or about May 12, 2014, Railroad entered into Rider No. 11 Renewal No. 1 (the "**Rider No. 11**") incorporating the terms of the Master Lease and superseding the May 12, 2004 Rider No. 11 to the Master Lease in its entirety. See **Exhibit C**.

10.     Railroad entered into Amendment No. 1 to the Master Lease, with the effective date of July 1, 2015. See **Exhibit D**.

11.     On or about October 11, 2019, Railroad entered into a Notice and Acknowledgment with non-party PNC Equipment Finance, LLC (the "**PNC Notice**"), which, *inter alia*, made Sections 5, 7, 9, 11 and 20 of the Master Lease inapplicable to the leasing of the Cars; added specific language about Railroad's obligations to maintain the hoods, covers and related lading devices installed on the Cars (the "**Covers**") throughout the term of the Lease; return the Covers to Lessor in a specified condition; and confirmed Lessor was the owner of the Covers. See Section 2(l) of **Exhibit E**.

12.     On or about June 28, 2023, Railroad executed a Notice and Acknowledgment of Assignment dated June 8, 2023 (the "**Amergin Notice**"), in which, *inter alia*, Railroad acknowledged and agreed that Amergin will be the owner of the Cars, and Railroad made certifications relating to the Lease and the Cars. See **Exhibit F** for the Amergin Notice and see **Exhibit G** for the "Closing Date Notice" dated August 1, 2023 that was executed and sent to Railroad.

13.     The scheduled Lease expiration date was August 31, 2024. See **Exhibit E**, Annex B and **Exhibit F**, Annex B.

14.     During the months leading to the expiration of the Lease, Railroad's stalling tactics hindered Amergin Rail 2023-1's ability to inspect the Cars. Specifically, and without limitation, Railroad delayed making the Cars available for inspection by Amergin Rail 2023-1 by August of

2024; Railroad limited the number of Cars available for inspection by Amergin Rail 2023-1, including making only 9 out of 10 Cars available for the sample inspection on July 2, 2024, and only making 21 out of 48 Cars available for the inspection on September 3, 2024; Railroad refused to remove the covers from the Cars for the onsite inspection conducted by Amergin Rail 2023-1 on September 3, 2024, despite Amergin Rail 2023-1's prior and contemporaneous requests to remove the covers; starting from May of 2024, Railroad continuously insisted on trying to make repairs in-house while failing to do so in a workmanlike and competent manner, and continuously refused Amergin Rail 2023-1's requests to send the Cars to third-party repair shops.

15.    Amergin Rail 2023-1 told Railroad on multiple occasions, verbally and via email, that the return location would depend on the condition of the Cars therefore the return location required Railroad to allow the Cars to be thoroughly inspected by Plaintiff. A thorough inspection was not granted by Railroad to Amergin Rail 2023-1 until October 22, 2024 and October 23, 2024, when Railroad removed the covers. In an email from Amergin Rail 2023-1 to Railroad on August 23, 2024, Amergin Rail 2023-1 communicated that the return location was contingent on the condition of the Cars. A copy of the email from Amergin Rail 2023-1 to Railroad dated August 23, 2024 is attached hereto as **Exhibit H**.

16.    Railroad, without any authority and over the repeated objections of Amergin Rail 2023-1 in August of 2024, scrapped the four Scrapped Cars. On information and belief, Railroad shipped the Scrapped Cars on or about a week prior to Amergin Rail 2023-1's September 3, 2024 inspection, to a facility for the Scrapped Cars to be disassembled and sold for the scrap metal value. On information and belief, Railroad retained proceeds generated from scrapping the Scrapped Cars. The four Scrapped Cars are HKRX42003, HKRX42009, HKRX42021 and HKRX42045.

17.    Amergin Rail 2023-1 sent a Notice of Default to Railroad dated September 11, 2024, relating to, *inter alia*, Railroad's failure to return the Cars by the August 31, 2024 Lease expiration date; Railroad's failure to maintain the Cars and Covers throughout the term of the Lease and return them in the condition required by the Lease; and Railroad's unauthorized scrapping of the Scrapped Cars. A Notice of Default to Railroad dated September 11, 2024 is attached as **Exhibit I**.

18.    Amergin Rail 2023-1 was only allowed to inspect the remaining 48 Cars with the Covers removed on October 22 and 23, 2024. None of the 48 inspected Cars were in the condition required by the terms of the Lease.

19.    On November 4, 2024, Amergin Rail 2023-1 sent a Further Notice of Default of Lease, reiterating, *inter alia*, Railroad's failure to maintain the Cars in the condition required by the terms of the Lease, and Amergin Rail 2023-1's intention to provide a third-party repair shop location for Railroad to ship the Cars for necessary repairs. A Further Notice of Default of Lease dated November 4, 2024 is attached as **Exhibit J**.

20.    Railroad delivered the remaining 48 Cars to the three different repair shops designated by Amergin Rail 2023-1 in a letter dated December 18, 2024.  See **Exhibit K**.

21.    Railroad has not paid any rent for the Cars for the period after August 31, 2024. The total unpaid rent due for the 48 Cars is approximately $305,474.16 as of December 1, 2025. See Spreadsheet, **Exhibit N** hereto.

22.    Despite the scheduled lease expiration date of August 31, 2024, the Lease term and Lessee's obligation to pay rent extends until "the day the last Car is returned to and accepted by Lessor." See **Exhibit C**, Rider No. 11, §4.  All the Cars failed to meet the contractual return requirements as set forth in the Lease. See **Exhibit A**, Master Lease Section 19 and Attachment

A, **Exhibit C**, Rider No. 11, Section 6B(b) and Section 8, **Exhibit E**, PNC Notice, Section 2(l), (collectively the "**Return Requirements**"). Hence, Lessor could not accept the Cars because the Cars were not in the condition specifically required by the Lease for return.  The repairs on 44 out of 48 Cars were completed on July 23, 2025. The repairs on the remaining four Cars were completed: (i) on July 29, 2025 for Car HKRX42024; (ii) on August 21, 2025 for Car HKRX42029; (iii) on July 28, 2025 for Car HKRX42044; and (iv) on August 8, 2025 for Car HKRX42052. Amergin Rail 2023-1 paid storage charges for 33 of the 48 Cars from April 2025 until August of 2025, at which point all of the 48 Cars were re-leased to a new lessee. The storage charges for the 33 Cars total $37,921.00. See Spreadsheet, **Exhibit N** hereto. The freight charges for 48 Cars are at least $60,262.72. See Spreadsheet, **Exhibit N** hereto.

23.     The "Lease is a net lease, and Lessee's obligation to pay all rent and all other amounts payable hereunder is ABSOLUTE AND UNCONDITIONAL …" See Rider No.11, §6A at **Exhibit C**.  Likewise, in a net lease the lessee (Railroad) assumes all costs and risks related to the operation and maintenance of the equipment. See Rider No.11, §6B(b): "Lessee will, at its own expense, keep and maintain the Cars in good repair, condition and working order and furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the value, condition, and operating efficiency thereof will at all times be maintained and preserved, reasonable wear and tear excepted. Lessee will cause each Car to be maintained in conformance with all rules and regulations of AAR and FRA[.]… Upon return of the Cars, Lessee will be responsible for any cost and expense due to Lessee's failure to not provide Lessor with sufficient maintenance and regulatory documentation."

## COUNT I
## BREACH OF CONTRACT

24.     Amergin Rail 2023-1 repeats and realleges Paragraphs 1 through 23 as though fully

set forth herein.

25.     Rider No. 11, Section 9 titled "Performance by Lessor" provides that "If Lessee fails or requests Lessor to perform any of Lessee's obligations, including without limitation, any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties." Hence, Lessee is liable to Lessor for all repair costs and other expenses Lessor incurred in connection with the repairs which Lessee failed to perform, plus a fee as provided for in Section 9 in an amount to be determined.

**Lessee failed to Maintain the Covers; all 52 Covers required repair or replacement**

26.     The PNC Notice (**Exhibit E**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") provides at Section 2(l):

> Lessee agrees and acknowledges that (i) Lessor is the owner of the hoods, covers and related lading devices installed on the Railcars (whether originally delivered with the Railcars or replacements thereof) (the "Covers"), (ii) without limiting Lessee's obligations under the Lease, Lessee shall arrange and pay for any and all maintenance required for the Covers during the term of the Lease and (iii) Lessee shall return the Railcars at the expiration or other termination of the Lease with the Covers in good condition, ordinary wear excepted, without damage and Lessee shall be responsible for all costs associated with the repair of [*sic*] replacement of missing or damaged Covers upon return of the Railcars to Buyer.

Lessee defaulted on its Lease obligations by (i) failing to "arrange and pay for any and all maintenance required for the Covers during the term of the Lease"; (ii) failing to return the Railcars to Lessor "with the Covers in good condition, ordinary wear excepted, without damage"; and (iii) failing to pay for "all costs associated with the repair of [*sic*] replacement of missing or damaged Covers upon return of the Railcars to [Plaintiff]."

8

27.     Because of Lessee's defaults, Lessor was required to repair the Covers for each of the 48 remaining Cars and such repairs included but are not limited to: (i) removal, repair and application of foam insulation, (ii) straightening bent hand rails and hand rail support brackets, (iii) straightening bent corner stakes, (iv) replacement of worn out or broken hood gaskets, and (v) straightening hood guides. See Spreadsheet, **Exhibits L** and **M,** columns K, L, and M.

28.     Hence, Plaintiff paid for said repairs to the Covers, and Railroad is responsible for said repairs. See (**Exhibit C**), Rider No. 11, Section 9 titled "Performance by Lessor" ("If Lessee fails or requests Lessor to perform any of Lessee's obligations, including without limitation, any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties.").

**In addition to Lessee's failures in maintaining and repairing Covers, Lessee also defaulted by not making other required repairs to each of the 48 Cars**

29.     Rider No. 11 (**Exhibit C**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") Section 6(B)(b)(iv) states:

> The Car(s) **must be** maintained **and returned**…(iv) **in compliance with the AAR**, US Department of Transportation ("DOT"), …, FRA and all other laws and regulations of the government or industry agency having authority over the uses, repair requirements, modifications, inspection and reporting for the Cars …. [emphasis added]

30.     Each and every one of the 48 Cars returned to Amergin Rail 2023-1 failed to meet the Return Requirements, for the purposes of this paragraph 30, specifically those identified in Section 6(B)(b)(iv), which expressly includes compliances with the AAR, DOT, FRA, and all other laws and regulations. See Spreadsheet, **Exhibits L**, **M**, and **N**, Columns L, M, and P,

identifying repairs made by third-party repair shops for each of the Cars, including violations found.

31.     In addition, Rider No. 11 (**Exhibit C**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") Section 6(B)(b) states:

> The Car(s) must be maintained and returned…(iv) suitable for the immediate loading, transporting, and unloading of commodities as defined herein. Lessee will be responsible for all expenses during and at the end of the term. Lessee will, at its own expense, keep and maintain the Cars in good repair, condition and working order and furnish all parts, replacements, mechanisms, devices and servicing required therefore so that the value, condition and operating efficiency thereof will at all times be maintained and preserved, reasonable wear and tear excepted.

32.     All of the 48 Cars were returned to Lessor requiring repairs to the interior loading and unloading devices. Hence, Plaintiff paid for said repairs to the interior loading and unloading devices, and Railroad is responsible for said repairs. See (**Exhibit C**), Rider No. 11, Section 9 titled "Performance by Lessor" ("If Lessee fails or requests Lessor to perform any of Lessee's obligations, including without limitation, any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties."). See Spreadsheet, **Exhibits L**, **M**, and **N**, Columns L, M, and P, identifying the repairs made by the third-party repair shops for each of the Cars, including the violations found. Cars requiring repairs to the interior loading and unloading devices include, without limitation, the following repairs: (i) elongated crossbar pin holes needed to be built up and then reamed out to create the proper size hole, (ii) bent crossbar tracks required straightening, (iii) loose and/or missing crossbar bolts and spacers had to be replaced and/or tightened, as applicable, (iv) broken

crossbar pins and chains had to be replaced and/or welded (v) broken thread bolts at wood flooring had to be replaced.

33.    Rider No. 11 (**Exhibit C**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") provides at Section 6B(a)(ii) that Lessee "will not permit any Car to be loaded improperly ….". Cars were loaded improperly. Whether or not the Cars were loaded by Railroad's customers, shippers, suppliers, or others, Railroad had the responsibility to ensure that loading was done correctly.  For example, coils were swung into the crossbars and ends of the Cars, rather than setting the coil and adjusting the crossbar to the coils[1].

34.    Rider No. 11 (**Exhibit C**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct.") provides at Section 6B(a): "Lessee will use the Cars in a careful and proper manner, will comply with and conform to all governmental laws, rules and regulations and industry association rules and regulations relating thereto, and will cause the Cars to be operated in accordance with the manufacturer's or supplier's instructions or manuals. Without limitation to the generality of the foregoing, Lessee will (i) cause the Cars to be used in compliance with all rules and recommendations of Association of American Railroads ("AAR") and Federal Railroad Administration ("FRA"); (ii) will not permit any Car to be loaded improperly or in excess of the load limit stenciled thereon; (iii) will not permit any Car to be loaded with any commodity other than the commodity designated herein[.]"

---

[1] The commodity transported in the Cars is coils of rolled steel. This product serves various purposes and industries being used in anything from making home appliances, to automobile parts to aspects of construction.

35.     Rider No. 11 (**Exhibit C**) (as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") provides at Section 6(B)(b)(i) that "The Car(s) must be maintained and returned (i) in a condition that would not otherwise constitute a "cause for attention or renewal" as defined in Section "A" of each rule of the Field Manual of the AAR then in effect[.]" None of the Cars were maintained as required. "Cause for attention" as to each of the Cars included: broken draft sills; improper or missing wear plates; wrong or missing friction castings; AAR Rule 88, B. 2b due to the amount of labor hours required to repair the Cars exceeding 85 hours of repair, etc. None of the Cars were returned as required by the Lease.

### Lessee defaulted by scrapping four of the Cars

36.     The Lease provides no right to Lessee to scrap any Cars regardless of the cost of repairing any Cars. Section 8 of the Master Lease (**Exhibit A**) expressly reserves for Lessor only the right to determine if a Car is "to be taken to a car shop for repairs…" or "…to substitute for any such car another car of the same type and capacity…"

37.     Lessee unilaterally scrapped the four Scrapped Cars despite repeated verbal and written directions not to do so from Lessor and in violation of the Lease. Rider No. 11 (**Exhibit C**) as incorporated by the Amergin Notice, **Exhibit F** Section 6, in which, Railroad acknowledged and affirmed that "[a]ll representations and warranties of the Lessee in the Lease and the other Lease Documents are true and correct") provides at §6(B)(c): "Lessee will not make or authorize any improvement, change, addition or alteration to the Cars (i) if such improvement, change or addition or alteration will impair the originally intended function or use of the Cars or impair the

value of the Cars as it existed immediately prior to such improvement, change, addition or alteration[.]"

38. On information and belief, Railroad shipped the Scrapped Cars on or about a week prior to Amergin Rail 2023-1's September 3, 2024 inspection, to a facility for the Scrapped Cars to be disassembled and sold for the scrap metal value, without authority to do so. The four Scrapped Cars are HKRX42003; HKRX42009; HKRX42021, and HKRX42045. See Spreadsheet, **Exhibit L**, Columns C and D for previous car marks and numbers.

39. Scrapping the four Scrapped Cars deprives Lessor of the value of the Cars, including Lessor's lost opportunity to re-lease the Cars to a new lessee.

40. When the Lease term is at an end, Lessor is entitled to the value of the Cars as if they had been returned in the condition required under the Lease. See, e.g., UCC 2A-532; 810 ILCS 5/2A-532 ("In addition to any other recovery permitted by this Article or other law, the lessor may recover from the lessee an amount that will fully compensate the lessor for any loss of or damage to the lessor's residual interest in the goods caused by the default of the lessee.").

## Lessee defaulted by failing to restencil Cars

41. The Master Lease (**Exhibit A**) at Attachment A, provides:

(C) Lessee shall be responsible, at its expense, for applying any allowed railroad reporting marks to any of the cars after delivery thereof to Lessee and for changing all railroad reporting marks and other related designations on each car back to reporting marks and designations specified by GERSCO [Amergin Rail 2023-1] prior to the last loaded move of the cars in the railroad's service, and Lessee shall give GERSCO [Amergin Rail 2023-1] at least five (5) days prior written notice of the date of such last loaded move; provided, however, Lessee shall give GERSCO [Amergin Rail 2023-1] at least sixty (60) days prior written notice of such restencilling [sic] for purposes of registration and regulatory compliance.

In order for the Cars to be restenciled, such process must be completed in compliance with AAR rules and standards. Despite Lessee's attempt to restencil the Cars, the reporting marks and

numbers were not compliant with AAR rule 80 therefore Amergin Rail 2023-1 paid the third-party repair shops to restencil the Cars. See, **Exhibit C**, Rider No. 11, §9 states: "If Lessee fails or requests Lessor to perform any of Lessee's obligations, including any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties."

42. Railroad is responsible for restenciling charges incurred by Amergin Rail 2023-1.

## Lessee defaulted by not returning all Cars to Lessor in the condition delivered to Lessee, reasonable wear and tear excepted

43. Lessee accepted the Fifty-Two Cars from lessor in 2004. See **Exhibit B**.

44. Acceptance of the Fifty-Two Cars is governed by the Master Lease at Section 4 which provides:

> Each of the cars shall be subject to Lessee's inspection upon delivery to Lessee. Failure to report any defect in the car within a reasonable time after delivery of the car or the loading of each such car by Lessee or at its direction shall constitute acceptance thereof by Lessee, and shall be conclusive evidence of the fit and suitable condition thereof for the purpose of transporting ….

Hence, per the Master Lease the Cars were without defect upon delivery. Further, Lessee confirmed the Cars were accepted in accordance with the Lease in both the PNC Notice and Amergin Notice. See also, **Exhibit E**, §2(f) and **Exhibit F**, §3.

45. As set forth in Section 6(B) of Rider No. 11 (**Exhibit C**), Lessee was obligated to use, maintain the Cars in compliance with AAR Rules, and keep the Cars in good repair, condition and working order. The Cars were not returned in the condition delivered (which was without defects), reasonable wear and tear excepted. As a result, Lessor has expended monies to put the Cars into the condition delivered, reasonable wear and tear excepted. Railroad is responsible for

14

those expenses. See, **Exhibit C**, Rider No. 11, §9 states: "If Lessee fails or requests Lessor to perform any of Lessee's obligations, including any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties."

**False Certification**

46.    The Notice and Acknowledgment of Assignment Dated June 8, 2023, §1 (**Exhibit F**), states that "[i]n recognition of Buyer's reliance upon this Notice, Lessee [Railroad] certifies, confirms and agrees as follows: … no default or event which, with the passage of time or the giving of notice, or both, would constitute a default under the Lease or the other Lease Documents has occurred." Based upon the numerous defaults under the Lease, *supra*, the certification and confirmation of Railroad – upon which Amergin Rail 2023-1, LLC specifically relied on was false. Thus, when Plaintiff purchased the Cars in 2023, Lessee certified that "no default or event which, with the passage of time or the giving of notice, or both, would constitute a default under the Lease or the other Lease Documents has occurred." See Amergin Notice (**Exhibit F**), §1. Lessee was in default of its certification because Lessee was in default under the Lease.

47.    When Plaintiff purchased the Cars, Lessee certified that the Equipment "is in the condition required by the terms of the Lease and is being operated by Lessee in accordance with the Lease Documents." See Amergin Notice (**Exhibit F**), §3. Lessee was in default of its certification because the Cars were not in the condition required by the terms of the Lease nor were the Cars being operated in accordance with the Lease.

48.    When Plaintiff purchased the Cars, Lessee certified that "All representations and warranties of Lessee in the Lease and the other Lease Documents are true and correct." See Amergin Notice (**Exhibit F**), §6. The representations were not true and correct.

49.    The Master Lease (**Exhibit A**) at §19 provides: "Upon termination of each rider, Lessee agrees, subject to the provisions of section 8 above [on totally damaged or destroyed cars] to return the cars to GERSCO [now Amergin Rail 2023-1] at a point or points designated by GERSCO [now Amergin Rail 2023-1] in the same or as good condition as received, ordinary wear and tear excepted, free from all charges and liens which may result from any act or default of Lessee, and free from all accumulations or deposits from commodities transported in or on the cars while in the service of Lessee. If any car is not returned to GERSCO free from such accumulations or deposits, Lessee shall reimburse GERSCO for any expense incurred in cleaning such car." None of the Cars was returned in the same or as good condition as received, ordinary wear and tear excepted and the majority of the Cars were not cleaned out.

50.    The Amergin Notice, §3 (**Exhibit F**) further provides that "[i]n recognition of Buyer's reliance upon this Notice, Lessee [Railroad] certifies, confirms and agrees as follows: The Equipment … is in the possession of the Lessee, is in the condition required by the terms of the Lease and is being operated by Lessee in accordance with the Lease Documents." However, as set forth in detail, *supra*, (i) the Cars are not in the condition required by the terms of the Lease, and (ii) Lessee was not operating the Cars in accordance with the Lease Documents.

51.    The Amergin Notice, §3 (**Exhibit F**) further provides that "[i]n recognition of Buyer's reliance upon this Notice, Lessee [Railroad] certifies, confirms and agrees as follows: … The Lease is current in all respects …".   However, as set forth in detail, *supra*, the Lease was clearly not "current in all respects."

16

**Additional defaults under the Lease**

52.     Rider No. 11 (**Exhibit C**) provides at §6(B)(b): "Lessee will at its own expense, keep and maintain the Cars in good repair, condition and working order and furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the value, condition and operating efficiency thereof will at all times be maintained and preserved, reasonable wear and tear excepted." Lessee failed to keep and maintain the Cars in good repair, condition and working order and to do so at its own expense. Lessee also failed to furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the value, condition and operating efficiency thereof was at all times maintained and preserved, reasonable wear and tear excepted.

53.     Rider No. 11 (**Exhibit C**) provides at §6(B)(b) that "The Cars must be maintained and returned…(iv) in compliance with the AAR, US Department of Transportation ("DOT")… FRA and all other laws and regulations of the government or industry agency having authority over the uses, repair requirements, modifications, inspection and reporting for the Cars…Lessee will cause each Car to be maintained in conformance with all rules and regulations of AAR and FRA…." Lessee failed to maintain and return the Cars in conformance with all rules and regulations of AAR and FRA. Items as simple as adjusting toggle clearance or a renewed coupling lever; and properly repairing broken center/draft sills per Rule 57 are examples of failures by Lessee. All of the 48 Cars had different AAR violations, some of the most prominent ones include: AAR rule 5 governing hoses was violated by Lessee because Lessee used incorrect hoses; AAR rule 79 pertains to hand holds, ladders, and corner posts which fall under safety appliances; draft sills improperly repaired and reinforced pursuant to AAR rule 57; AAR rule 59 pertains to cushioning units which was violated by Lessee not replacing as needed causing such cushioning units to be worn out or defective; AAR rule 46 governs friction castings and shoes which Lessee

violated by replacing incorrectly and not requesting owner's (Lessor's) permission to replace with a resilient backed casting instead of all steel. See Spreadsheet, **Exhibit M**, Column M, specifying additional violations.

54.    Rider No. 11 (**Exhibit C**) provides at §6(B)(c) that "Lessee will not make or authorize any improvement, change, addition or alteration to the Cars…(ii) unless the parts installed are new and in compliance with all rules and recommendations of AAR and FRA…or (iv) without prior written consent of Lessor." In Railroad's failure to make correct repairs, it used parts not in compliance with AAR rules. For instance, Lessee replaced intermediate hoses with ones too short, violating AAR rules; updated decals in various locations not in compliance with AAR rules; applied incorrect carrier wear plates; put 4 port adapter on Cars but did not run single car test required per AAR rule 3 chart A; replaced running boards but used incorrect hardware.

**Lessee's additional specific contractual obligation to pay damages to Lessor**

55.    Lessee is contractually obligated to pay Lessor for all expenses incurred by Lessor to put the Cars into the condition required by the Lease. Specifically, Rider No. 11 (**Exhibit C**), §6B(b) states: "Lessee will be responsible for all expenses during and at the end of the term…." and §9 states: "If Lessee fails or requests Lessor to perform any of Lessee's obligations, including any Lessee maintenance or repair obligations, Lessor (by itself or through third parties) may perform such obligations, and Lessee shall, upon demand, pay Lessor for all expenses incurred plus a fee for processing invoices for services performed by third parties." Hence, Lessee is responsible for any and all expenses necessary to repair the Cars plus a fee as provided for in Section 9 in an amount to be determined.

56.    Here, despite demand, Lessee has failed to pay Lessor for any expenses incurred by Lessor necessary to put the Cars into compliance with the Return Requirements.

18

57.     Rider No. 11 (**Exhibit C**), §6B provides: "Upon return of the Cars, Lessee will be responsible for any cost and expense due to Lessee's failure to not provide Lessor with sufficient maintenance and regulatory documentation."

58.     Here, Lessee has failed to pay the costs and expenses due to its failure to provide Lessor with sufficient maintenance documentation.

59.     Lessee was contractually obligated to return all the Cars in accordance with the Return Requirements on or before August 31, 2024. Pursuant to Rider No. 11 (**Exhibit C**), §8, Lessee is contractually obligated to pay the daily rental for each and every Car not returned by August 31, 2024, which such daily rental amount varied by month, depending on the number of days, and was approximately $14.50 [30-day month] and $14.03 [31-day month] per Car.  For any Car not returned within 90 days [November 29, 2024] the daily rental rate increased to approximately $19.42 [28-day month], $18.13 [30-day month], and $17.54 [31-day month] per Car.

60.     Rider No. 11 (**Exhibit C**) provides at §6(B)(b): "Lessee will be responsible for all expenses during and at the end of the term." Lessee refuses to be responsible for all expenses at the end of the term. Lessee refuses to be responsible for all contractually obligated expenses during the term.

61.     As a direct and proximate result of Lessee's breach of the Lease, Amergin Rail 2023-1 has suffered damages in the amount of not less than $1,405,491.85, consisting of approximately $305,474.16 for unpaid rent, plus $37,921.00 for storage charges, plus $727,157.97 for repair charges (inclusive of restenciling fees), plus at least $60,262.72 for freight charges, plus approximately $274,676.00, representing the fair market value of the Scrapped Cars, plus a fee for processing invoices for services performed by third parties in an amount to be determined.

### COUNT II
**EQUITABLE ESTOPPEL ARISING OUT OF THE ESTOPPEL CERTIFICATE WITHIN THE NOTICE AND ACKNOWLEDGEMENT OF ASSIGNMENT**

62.    Amergin Rail 2023-1 restates and re-alleges Paragraphs 1 through 61 of this Complaint as though fully set forth herein.

63.    The Amergin Notice, §3 (**Exhibit F**) provides that "[i]n recognition of Buyer's reliance upon this Notice, Lessee [Railroad] certifies, confirms and agrees as follows: The Equipment … is in the possession of the Lessee, is in the condition required by the terms of the Lease and is being operated by Lessee in accordance with the Lease Documents." However, as set forth in detail, *supra*, (i) the Cars were not in compliance with the Return Requirements, and (ii) the Lessee was not operating the Cars in accordance with the Lease.

64.    Here, Railroad concealed and/or misrepresented facts pertaining to the condition of the Cars and Railroad's failure to operate the Cars in accordance with the Lease. Railroad falsely certified in the Amergin Notice that it was complying with Lessee's contractual Lease obligations and was not in default.

65.    Railroad knew that the certification was false at the time the certification was entered into in 2023. Railroad knew that the condition of the Cars, and the manner in which the Cars were operated, contravened the terms of the Lease.

66.    At the time of Lessee's false certifications in 2023, Amergin Rail 2023-1 did not know that it was false.

67.    Lessee intended or reasonably expected that Amergin Rail 2023-1 would rely on the certification that Lessee was compliant with the terms of the Lease, and based on Lessee's false certifications, Lessor purchased the Cars in July of 2023 under the expectation that no defaults existed.

68. Lessor reasonably relied upon the representations made by Lessee in the certification in good faith to its detriment in that Lessor relied on Lessee's representations and assurances that Lessee was complying with Lessee's contractual Lease obligations, including those pertaining to the condition of the Cars, the way in which the Cars were operated, and that Lessee was not in default. But for Lessee's false certifications, Amergin Rail 2023-1 would not have purchased the Cars, or the Cars would have been purchased at a reduced price.

69. Amergin Rail 2023-1 is prejudiced by its reliance on the false representation of Lessee. Lessor incurred significant financial damages as a result of the false certifications. Such damages include, but are not limited to significant repair expenses and financial loss associated with the destruction of the Scrapped Cars. As discussed, *supra*, but for Defendant's false representation, Lessor would not have purchased the Cars, or the Cars would have been purchased at a reduced price.

70. As a direct and proximate result of Lessee's false representation, Amergin Rail 2023-1 has suffered damages in the amount of not less than $1,405,491.85, consisting of approximately $305,474.16 for unpaid rent, plus $37,921.00 for storage charges, plus $727,157.97 for repair charges (inclusive of restenciling fees), plus at least $60,262.72 for freight charges, plus approximately $274,676.00, representing the fair market value of the Scrapped Cars.

## <u>COUNT III</u>
### IN THE ALTERNATIVE TO BREACH OF CONTRACT, UNJUST ENRICHMENT

71. Amergin Rail 2023-1 restates and re-alleges Paragraphs 1 through 70 of this Complaint as though fully set forth herein.

72. Lessee has unjustly retained a benefit to the detriment of Lessor.

73. Amergin Rail 2023-1 purchased the Cars based on the false representations made

by Defendant as discussed *supra*. If the false misrepresentations had not been made, Lessor would not have purchased the Cars or Lessor would have paid a reduced price for the Cars.

74. Lessee unjustly retained a benefit because Lessee's failure to comply with its obligations under the Lease exacerbated the deterioration of the Cars, including the Covers. Likewise, Lessee unjustly retained a benefit because Lessor's purchase of the Cars allowed Lessee to continue leasing the Cars, without complying with the Lease requirements.

75. Lessee retained the benefit of leasing the Cars without complying with the Lease terms (and making misrepresentations about its compliance) violates the fundamental principles of justice, equity, and good conscience because the damages caused to the Cars by Lessee resulted in, *inter alia*, (i) the total loss of the Scrapped Cars, (ii) Lessor paying third-party repair shops for significant repairs for the remaining 48 Cars, including the Covers, (iii) unpaid rent, and (iv) additional charges incurred for the storage and movement of the Cars.

76. Lessee's retention of the benefit of the lease of the Cars caused Lessor to incur damages in the amount of not less than $1,405,491.85, consisting of approximately $305,474.16 for unpaid rent, plus $37,921.00 for storage charges, plus $727,157.97 for repair charges (inclusive of restenciling fees), plus at least $60,262.72 for freight charges, plus approximately $ 274,676.00, representing the fair market value of the Scrapped Cars.

## COUNT IV
### INTENTIONAL MISREPRESENTATION

77. Amergin Rail 2023-1 restates and re-alleges Paragraphs 1 through 76 of this Complaint as though fully set forth herein.

78. Amergin Notice, §3 (**Exhibit F**) provides that "[i]n recognition of Buyer's reliance upon this Notice, Lessee [Railroad] certifies, confirms and agrees as follows: The Equipment …

is in the possession of Lessee, is in the condition required by the terms of the Lease and is being operated by Lessee in accordance with the Lease Documents."

79. Such statement constitutes a statement of material fact made by Defendant which was untrue. Defendant knew that it was untrue because by virtue of using the Cars, Defendant knew that *inter alia*, as set forth in detail, *supra*, (i) the Cars were not in the condition required by the terms of the Lease, and (ii) Lessee was not operating the Cars in accordance with the Lease.

80. Defendant made the statement in the Amergin Notice with the intent to induce actions or inaction by Plaintiff, which enabled the Defendant to continue leasing and using (operating) the Cars.

81. Lessor relied upon the false representations made by Lessee in the certification to its detriment. Lessor relied on Lessee's representations and assurances that Lessee was complying with Lessee's contractual Lease obligations. But for Lessee's false certification, Lessor would not have purchased the Cars, or the price paid by Lessor would have been lower.

82. Amergin Rail 2023-1 suffered injury from its reliance on Defendants' false representations. Lessor incurred significant financial damages as a result of the false certification. Such damages include, but are not limited to (i) the total loss of the Scrapped Cars, (ii) Lessor paying third-party repair shops for significant repairs for the remaining 48 Cars, including Covers, (iii) unpaid rent, (iv) additional charges incurred for the storage and movement of the Cars.

83. As a direct and proximate result of Lessee's false representation, Amergin Rail 2023-1 has suffered damages in the amount of not less than $1,405,491.85, consisting of approximately $305,474.16 for unpaid rent, plus $37,921.00 for storage charges, plus $727,157.97 for repair charges (inclusive of restenciling fees), plus at least $60,262.72 for freight charges, plus approximately $274,676,00 representing the fair market value of the Scrapped Cars.

<u>**COUNT V**</u>
**BREACH OF STATUTORY DUTIES IMPOSED UNDER ARTICLE 2A OF THE
UNIFORM COMMERCIAL CODE**

84.    Amergin Rail 2023-1 restates and re-alleges Paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85.    As a Lessor, Amergin Rail 2023-1, has various available remedies as a result of Lessee's defaults. UCC 2A-523; 810 ILCS 5/2A-523 (The lessor has various remedies available, including canceling the lease contract, withholding delivery or taking possession of the goods, disposing of the goods and recovering damages, or retaining the goods and recovering damages or rent. The lessor may also exercise any other rights or pursue any other remedies provided in the lease contract.)

86.    As a result of Railroad's defaults under the Lease, Amergin Rail 2023-1 had a right to take possession of the Cars.  UCC 2A-525(2); 810 ILCS 5/2A-525 (2) ("After a default by the lessee under the lease contract of the type described in Section 2A-523(1) or 2A-523(3)(a) [810 ILCS 5/2A-523] or, if agreed, after other default by the lessee, the lessor has the right to take possession of the goods.").

87.    As a result of Railroad's defaults under the Lease, Amergin Rail 2023-1 had a right to dispose of the Cars. UCC 2A-527(1); 810 ILCS 5/2A-527(1) ("After a default by a lessee under the lease contract of the type described in Section 2A-523(1) or 2A-523(3)(a) [810 ILCS 5/2A-523] or after the lessor refuses to deliver or takes possession of goods (Section 2A-525 or 2A-526 [810 ILCS 5/2A-525 or 810 ILCS 5/2A-526]), or, if agreed, after other default by a lessee, the lessor may dispose of the goods concerned or the undelivered balance thereof by lease, sale, or otherwise.").

88.    As a result of Railroad's defaults under the Lease, Amergin is entitled to various

damages. UCC 2-A-528; 810 ILCS 5/2A-528:

> (1) Except as otherwise provided with respect to damages liquidated in the lease agreement (Section 2A-504 [810 ILCS 2A-504]) or otherwise determined pursuant to agreement of the parties (Sections 1-302 and 2A-503 [810 ILCS 5/1-302 and 810 ILCS 5/2A-503]), if a lessor elects to retain the goods or a lessor elects to dispose of the goods and the disposition is by lease agreement that for any reason does not qualify for treatment under Section 2A-527(2) [810 ILCS 5/2A-527], or is by sale or otherwise, the lessor may recover from the lessee as damages for a default of the type described in Section 2A-523(1) or 2A-523(3)(a) [810 ILCS 5/2A-523] or, if agreed, for other default of the lessee, (i) accrued and unpaid rent as of the date of default if the lessee has never taken possession of the goods, or, if the lessee has taken possession of the goods, as of the date the lessor repossesses the goods or an earlier date on which the lessee makes a tender of the goods to the lessor, (ii) the present value as of the date determined under clause (i) of the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods are located computed for the same lease term, and (iii) any incidental damages allowed under Section 2A-530 [810 ILCS 5/2A-530], less expenses saved in consequence of the lessee's default.

> (2) If the measure of damages provided in subsection (1) is inadequate to put a lessor in as good a position as performance would have, the measure of damages is the present value of the profit, including reasonable overhead, the lessor would have made from full performance by the lessee, together with any incidental damages allowed under Section 2A-530 [810 ILCS 5/2A-530], due allowance for costs reasonably incurred and due credit for payments or proceeds of disposition.

89.    As a result of Railroad's defaults under the Lease, Amergin Rail 2023-1 is entitled to its incidental damages. UCC 2A-530; 810 ILCS 5/2A-530 ("Incidental damages to an aggrieved lessor include any commercially reasonable charges, expenses, or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the lessee's default, in connection with return or disposition of the goods, or otherwise resulting from the default.")

90.    When the Lease term is at an end, Lessor is entitled to the value of the Cars as if they had been returned in the condition required under the Lease. See, e.g., UCC 2A-532; 810 ILCS 5/2A-532 ("In addition to any other recovery permitted by this Article or other law, the lessor may recover from the lessee an amount that will fully compensate the lessor for any loss of or damage to the lessor's residual interest in the goods caused by the default of the lessee.").

25

91.    As a direct and proximate result of Lessee's breaches of Lessee's statutory duties pursuant to Article 2A of the Uniform Commercial Code, Amergin Rail 2023-1 has suffered damages in the amount of not less than $1,405,491.85, consisting of approximately $305,474.16 for unpaid rent, plus $37,921.00 for storage charges, plus $727,157.97 for repair charges (inclusive of restenciling fees), plus at least $60,262.72 for freight charges, plus approximately $274,676,00 representing the fair market value of the Scrapped Cars.

**COUNT VI**
**CONVERSION OF THE SCRAPPED CARS**

92.    Amergin Rail 2023-1 restates and re-alleges Paragraphs 1 through 91 of this Complaint as though fully set forth herein.

93.    Amergin Rail 2023-1 is the owner of the Cars by virtue of sale and assignment. See **Exhibit E** and **Exhibit F** hereto. The Lease does not authorize Lessee to scrap the Cars.

94.    Amergin Rail 2023-1 had an absolute and unconditional right to the immediate possession of the Cars, after the termination of Lease on August 31, 2024, or as a result of Defendants' multiple failures to perform its obligations under the Lease. See Section 18 of the Master Lease (**Exhibit A**).

§ 18.    If Lessee shall fail to perform any of its obligations hereunder, GERSCO at its election may either (a) terminate this Agreement immediately and repossess the cars, or (b) withdraw the cars from the service of Lessee and deliver the same, or any thereof, to others upon such terms as GERSCO may see fit. If GERSCO shall elect to proceed in accordance with clause (b) above and if GERSCO during the balance of the term of this Agreement shall fail to collect for the use of the cars a sum at least equal to all unpaid rentals hereunder to the stated date of termination hereof plus an amount equal to all expenses of withdrawing the cars from the service of Lessee and collecting the earnings thereof. Lessee agrees to pay from time to time upon demand by GERSCO the amount of any such deficiency. It is expressly understood that GERSCO at its option may terminate this Agreement in the event that a petition in bankruptcy or a petition for a trustee or receiver be filed by or against Lessee or in the event that Lessee shall make an assignment for creditors.

95.    On August 19, 2024, Lessee promised to set aside the Scrapped Cars for inspection

26

by Plaintiff.

96.     The Lease provides no right to Lessee to scrap any Cars regardless of the cost of repairing any Cars. Section 8 of the Master Lease (**Exhibit A**) expressly reserves for Lessor only the right to determine if a Car is "to be taken to a car shop for repairs…" or "…to substitute for any such car another car of the same type and capacity…"

97.     Railroad wrongfully and without authorization assumed control, dominion, or ownership over Cars HKRX42003; HKRX42009; HKRX42021, and HKRX42045. Railroad unilaterally scrapped the four Scrapped Cars in spite of repeated verbal and written directions not to do so from Lessor and in violation of the Lease. Rider No. 11 (**Exhibit C**) which provides at §6(B)(c): "Lessee will not make or authorize any improvement, change, addition or alteration to the Cars (i) if such improvement, change or addition or alteration will impair the originally intended function or use of the Cars or impair the value of the Cars as it existed immediately prior to such improvement, change, addition or alteration[.]"

98.     Amergin Rail 2023-1 suffered damages as a result of Lessee's conversion, such as approximately $274,676.00, representing the fair market value of the four Cars, including the lost opportunity to re-lease the Cars to a new lessee.

WHEREFORE, Plaintiff AMERGIN RAIL 2023-1, LLC respectfully requests that this Honorable Court enter judgment in its favor and against Defendant INDIANA HARBOR BELT RAILROAD COMPANY, in the amount of not less than $1,500,000.00, plus prejudgment interest of 5% per annum, pursuant to 815 ILCS 205/2, and award such other and further relief as this Court deems just and proper.

Respectfully Submitted,

AMERGIN RAIL 2023-1, LLC,

By:    /s/ Eleonora P. Khazanova
       Eleonora P. Khazanova
       One of Its Attorneys

Kenneth D. Peters (IL ARDC # 6186034)
Eleonora P. Khazanova (IL ARDC # 6293116)
**Dressler & Peters, LLC**
101 W Grand Ave, Suite 404
Chicago, IL 60654
Phone: (312) 602-7360
Fax: (312) 637-9378
Email: kpeters@dresslerpeters.com
ekhazanova@dresslerpeters.com