UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

AMERGIN RAIL 2023-1, LLC,    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 2:25-cv-568-AZ
    )
INDIANA HARBOR BELT RAILROAD    )
COMPANY,    )
    )
    Defendant.    )

## OPINION AND ORDER

This matter is before the Court on Defendant Indiana Harbor Belt Railroad Company's ("Indiana Harbor") Motion to Dismiss [DE 12], filed on February 10, 2026. On March 30, 2026, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). DE 25. On March 31, 2026, Plaintiff Amergin Rail 2023-1 LLC ("Amergin Rail") filed a response in opposition to the motion, DE 26, and on April 21, 2026, Defendant filed its reply. DE 29. The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss, for the reasons discussed.

## Background

The Court draws its factual summary from Plaintiff's complaint, as it must at this procedural posture. In 1988, Indiana Harbor signed a written lease for railcars with an entity called General Electric Railcar Services Corporation. DE 1 (Compl.) at ¶ 7. The ownership of the railcars subsequently passed to other entities several times and the lease was amended and extended via various amendments and riders over the years. *Id.* at ¶¶ 8-11. For example, a 2019 amendment imposed specific duties on

Indiana Harbor, as lessee, regarding maintenance and return of the railcars and specific components. *E.g.*, *id.* at ¶ 11 (alleging that the 2019 amendment "added specific language about [Indiana Harbor's] obligations to maintain the hoods, covers and related lading devices installed on the Cars (the "Covers") throughout the term of the Lease; return the Covers to Lessor in a specified condition; and confirmed Lessor was the owner of the Covers."). The lease ran through August 31, 2024. *Id.* at ¶ 13.

Flash forward to summer 2023 when Plaintiff Amergin Rail enters the picture as a prospective buyer of the railcars that continued to be leased and used by Defendant Indiana Harbor. In June 2023, PNC Bank N.A. was the owner of the railcars and held the lease. On or around June 28, 2023, Defendant was made aware of a potential sale of the railcars when it executed a "Notice and Acknowledgement of Assignment" which indicated that an entity called "Amergin Asset Management LLC" would be purchasing the cars as "Buyer." DE 1 at ¶ 12; *id.* at Ex. F. Amergin Asset Management is a different entity than Plaintiff, but as explained in a declaration attached to Plaintiff's response brief, is an affiliated entity and the manager of Plaintiff Amergin Rail. DE 26-1 (Decl. of J. Rosen) ¶ 3.[1] In the same Notice and Acknowledgement of Assignment, Indiana Harbor agreed to certain statements "[i]n recognition of Buyer's reliance upon this Notice" and Indiana Harbor "certifie[d],

---

[1] While normally at the motion to dismiss stage, the Court's review is confined to the pleadings, a party opposing a motion to dismiss "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 746 n.1 (7th Cir. 2012). And likewise, when jurisdiction is called into question, as here, the Court may look beyond the pleadings to determine whether subject matter jurisdiction exists. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020).

confirm[ed], and agree[d]" that it had not defaulted on the lease of the railcars, that the railcars (defined as "The Equipment") were "in the condition required by the terms of the Lease," and that they were "being operated by Lessee in accordance with the Lease Documents." DE 1 at ¶¶ 46-47; *id.* at Ex. F. Plaintiff alleges that these statements were untrue when made, that Defendant knew they were untrue at that time, and that if Plaintiff had known the true condition of the railcars at the time, it would not have gone through with the purchase. But more on that later.

On July 31, 2023, the sale of the railcars was completed, but the purchaser was Amergin Rail (as opposed to Amergin Asset Management LLC, the entity originally listed on the Notice and Acknowledgment signed by Defendant roughly a month prior). DE 1 at ¶ 12; *id.* at Ex. G. *See also id.* at ¶ 2 ("Amergin Rail 2023-1 is the owner and lessor under the Lease of the fifty-two Cars that are the subject matter of this Complaint."); *id.* at ¶ 3 ("Non-party Amergin Asset Management, LLC, a Delaware limited liability company, acted as the servicer for the Cars under the Lease since the Cars were acquired by Plaintiff on July 31, 2023 and continues to act as servicer under the Lease (as defined below)."). The following day, on August 1, 2023, Defendant received a "Closing Date Notice" alerting it to the purchase which identified Amergin Rail as the new owner. *Id.* at ¶ 12.

Plaintiff then alleges that over the following year, Indiana Harbor "engaged in a variety of stalling tactics that hindered [Plaintiff's] ability to inspect the [railcars]." DE 1 at ¶ 16. These alleged stalling tactics occurred even beyond the end of the lease on August 31, 2024, and Plaintiff says the railcars were not made available for

3

inspection until late October 2024. *Id.* at ¶ 15. When Plaintiff finally inspected the railcars that had been in Indiana Harbor's continued possession, it learned they were in substantially worse condition that they were led to believe and specifically worse than Indiana Harbor had certified back in June 2023. Furthermore, at some point prior to the expiration of the lease, Defendant "scrapped" four of the railcars without authority and retained the proceeds generated by the scrapping of those four railcars, despite objections from Plaintiff. *Id.* at ¶ 16.

Plaintiff filed suit on December 21, 2025, alleging numerous different claims against Indiana Harbor. Plaintiff has sued for breach of contract, conversion, breach of duties under Article 2A of the Uniform Commercial Code ("UCC"), equitable estoppel, unjust enrichment, and intentional misrepresentation, seeking damages in excess of $1.5 million.

## Discussion

Defendant's motion raises multiple arguments ranging from jurisdiction to standing to technical pleading deficiencies to substantive challenges to the specific claims under Illinois law. In other words, it is a full-blown assault on Plaintiff's case from nearly every angle. As explained below, the motion will only be granted in part.

To survive a motion to dismiss, a "complaint must contain allegations that collectively 'state a claim to relief that is plausible on its face.'" *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court accepts "all well-pleaded allegations of fact as true and draw all reasonable inferences in the plaintiffs' favor." *Alarm*

*Detection Sys.*, 930 F.3d at 821. But bare "[l]egal conclusions" such as an assertion Defendant violated a statute or common law duty without more, "do not get the same benefit;" and the Court will disregard those. *Id.* (citing *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)). "If the well-pleaded allegations plausibly suggest— as opposed to possibly suggest—that the plaintiffs are entitled to relief, the case enters discovery," otherwise "dismissal is appropriate." *Id.* (citations omitted). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" in evaluating the pleadings at issue. *Iqbal*, 566 U.S. at 679.

## I.    Whether Plaintiff Adequately Pleads Diversity Jurisdiction

"[T]he first and fundamental question" in any federal court litigation "is that of jurisdiction," and the Court must decide that issue before proceeding further on the merits. *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900); *Page v. Democratic Nat'l Comm.,* 2 F.4th 630, 634 (7th Cir. 2021) ("[T]he Supreme Court has long instructed, federal courts, as courts of limited jurisdiction, must make their own inquiry to ensure that all statutory requirements are met before exercising jurisdiction."). Only if the Court is satisfied that it has jurisdiction over the dispute, can it exercise that jurisdiction by weighing in on the merits and substance of the allegations. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court

is that of announcing the fact and dismissing the cause.") (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)).

"Federal district courts are courts of limited jurisdiction; '[t]hey possess only that power authorized by Constitution and statute.'" *Smart v. Loc. 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 802 (7th Cir. 2009) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 552 (2005)). "Congress has conferred subject matter jurisdiction on the district courts only in cases that raise a federal question and cases in which there is diversity of citizenship among the parties." *Id.* (citing 28 U.S.C. §§ 1331–32). Thus, unless Plaintiff's complaint falls into one of those categories, its action must be dismissed for lack of jurisdiction.

The sole basis for the Court's jurisdiction asserted in Plaintiff's complaint is diversity jurisdiction under 28 U.S.C. § 1332(a). This requires "complete diversity" of citizenship between Plaintiff and Defendant. *Id.* For individuals, citizenship is typically the state of residence, but corporations take the citizenship of their state of incorporation and where they have their "principal place of business." 28 U.S.C. § 1332(c)(1). Other types of business entities aren't quite as straightforward. Limited liability companies, or LLCs (like Plaintiff), have their citizenship determined by looking to the citizenship of all of their members. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) ("For diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members … and, if those members have members, the citizenship of those members as well.").

6

Thus, LLCs can be the citizens of multiple states or countries for jurisdictional purposes. *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003). And where one of those members is an LLC itself (or similar unincorporated entity), "district courts must continue to drill down until they hit jurisdictional bedrock (meaning a corporation or a natural person)." *Calchi v. TopCo Associates, LLC*, 676 F. Supp.3d 604, 611 (N.D. Ill. 2023).

Here, Defendant Indiana Harbor argues that the Plaintiff has failed to adequately demonstrate its own citizenship and so the Court cannot be assured jurisdiction exists. Indiana Harbor is a corporation registered under the laws of Indiana with its principal place of business in Indiana. DE at ¶ 4. So, it is clearly a citizen of Indiana. Plaintiff's citizenship is not so clear from the pleadings. The complaint states:

> Amergin Rail 2023-1 is a Delaware limited liability company with the following members who have the following citizenship: a) AAM Series, LLC, Series 1.1 Rail and Domestic Intermodal Assets Holding Company is a Delaware limited liability company and is the sole member of Amergin Rail 2023-1; b) AAM Series 1.1 Rail and Domestic Intermodal Feeder, LLC is a Delaware limited liability company and is the sole member of AAM Series, LLC, Series 1.1 Rail and Domestic Intermodal Assets Holding Company; c) four Delaware limited liability companies are the members of AAM Series 1.1 Rail and Domestic Intermodal Feeder, LLC; and d) each of the such four limited liability companies are owned by one Delaware corporation. All such companies have a principal place of business in New York.

DE 1 at ¶ 1. That summary suggests that Plaintiff is a citizen of Delaware and New York once the multiple levels of LLCs are passed through. But specific information about each level is lacking.

Plaintiff has since provided additional information which confirms the Court's jurisdiction, although it would have been better to have included the complete and accurate information in the first instance. In response to Defendant's challenge to jurisdiction, Plaintiff has attached a declaration from Jerrold Rosen, the COO and General Counsel of Amergin Asset Management, LLC (the entity which was originally noted in the sale documents as the Buyer and which is the manager of Plaintiff) which provides additional information about Plaintiff's members. It also corrects the state of incorporation and number of corporations ultimately owning the constituent LLCs. While typically the Court only considers the pleading and documents attached to them when ruling on a motion to dismiss, when jurisdiction is called into question, it may look outside the pleadings to ensure it possesses jurisdiction. *See Bazile*, 983 F.3d at 279.

The Rosen declaration and its attachments demonstrate that Plaintiff has one member, another LLC named "AAM Series, LLC Series 1.1 Rail and Domestic Intermodal Assets Holding Company." DE 26-1 (Rosen Decl.) at ¶ 7. That entity in turn has a single member, another LLC named "AAM Series 1.1 Rail and Domestic Intermodal Feeder, LLC." *Id.* at ¶ 8. That entity in turn has four members: (1) ORCC AAM RH LLCa; (2) ORCC II AAM RH LLC; (3) ORTF AAM RH LLC; and (4) ORCIC AAM RH LLC. *Id.* at ¶¶ 9-13. Finally, those four entities are "owned by" four individual corporations "Blue Owl Capital Corporation"; "Blue Owl Capital Corporation II"; "Blue Owl Technology Finance Corp."; and "Blue Owl Credit Income Corp." all of which are entities incorporated in Maryland (as opposed to Delaware, as

8

alleged in the complaint, *see* DE 1 at ¶ 1) with a principal place of business in New York. *Id.*[2]

Plaintiff is thus a citizen of Maryland and New York, and not Indiana. Plaintiff has therefore cured the inadequate information in the complaint and sufficiently demonstrated that the parties are diverse. Because the amount in controversy more than clears the necessary threshold (Plaintiff seeks in excess of $1.5 million), Plaintiff has satisfied its burden to show the Court has jurisdiction to resolve the remaining substantive legal arguments raised by Defendant.

## II.     Whether Plaintiff Has Standing to Pursue Its Claims

Defendant's next argument is that Plaintiff lacks "standing" to pursue its breach of contract claim. Specifically, while the complaint alleges that Amergin Rail is the owner of the railcars and through the 2023 transaction, the lessor under the lease, Indiana Harbor argues the Court should ignore that allegation because the 2023 transaction-related documents attached to the complaint supposedly contradict

---

[2] In its reply brief, Defendant notes the change in wording in the Rosen declaration between saying that some LLCs having "a sole member" where others are declared to be "owned" by a one of the Blue Owl corporations. *See* DE 29 at 4. In doing so, Defendant suggests Plaintiff may be intentionally concealing necessary information from the Court.

The Court assumes these statements in the Rosen declaration to all mean the same thing because that is certainly the impression that Plaintiff gives in their briefing where they acknowledge an LLC's citizenship is that of all of its members and their members so on and so forth. The Court will not infer bad faith by omission or inartful drafting. However, to the extent, (1) ORCC AAM RH LLC; (2) ORCC II AAM RH LLC; (3) ORTF AAM RH LLC; and (4) ORCIC AAM RH LLC have any other members beyond those identified in the Rosen declaration, the Court will order Plaintiff to disclose those in any amended complaint and its revised FRCP. 7.1 corporate disclosure.

If either document reveals additional members or is otherwise inconsistent with Plaintiff's most recent assertions and declarations regarding its citizenship, it will raise serious concerns and force the Court to reassess its decision on diversity jurisdiction.

that allegation. *See* DE 13 at 8 ("Plaintiff has not demonstrated it owns the railcars or that it has standing to assert the claims it seeks to assert. Instead, it apparently expects the Court to take it at its word…"); *id.* at 9 ("Plaintiff's unsupported allegations are not enough."). This argument fails for several reasons.

As a starting point, Defendant appears to conflate the requirements of constitutional standing under Article III with whether Plaintiff has sufficiently pled a claim for breach of contract by arguing that Plaintiff fails to demonstrate with evidence precisely how ownership of the railcars passed to it. While these two things could be superficially related, they are not the same thing. Article III standing looks to whether a plaintiff has suffered a concrete injury traceable to a defendant's conduct that is redressable by the Courts, whereas determining whether a party can enforce a contract looks to whether it is actually party to the contract at issue. *See Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (restating the elements of standing as "(i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision.") (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).

Defendant faults Plaintiff for failing to provide evidentiary proof of its ownership at the pleading stage. *See* DE 29 at 3  (where "standing is challenged as a factual matter, the plaintiff must come forward with 'competent proof'—that is a

showing by a preponderance of the evidence—that standing exists.") (quoting *Lee*, 330 F.3d at 468). But because this argument really goes to whether Plaintiff has validly stated a breach of contract claim, the Court can in fact take Plaintiff "at its word," despite Defendant's protests to the contrary. Indeed, the Court *must* take Plaintiff's pleadings at their word when ruling on a motion to dismiss. *See Tellabs Inc. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

In the end, regardless of how Defendant's argument is framed, it fails because Plaintiff's complaint clears the minimal threshold for both constitutional standing and the elements of a breach of contract claim. Plaintiff, as lessor, has alleged an injury in the form of Indiana Harbor, as lessee, failing to satisfy its obligations under the lease. The alleged breaches are spelled out at length in the complaint, *see* DE 1 at ¶¶ 26-61. Plaintiff further pleads that it is the owner and lessor of the railcars and was therefore injured when they were damaged or misused. *Id*. at ¶ 2. And damage to property is a classic type of injury redressable by the courts. That satisfies Article III standing. These same allegations further satisfy the basic elements of breach of contract under Illinois law. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) ("The required elements of a breach of contract claim in Illinois are the standard ones of common law: (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages.") (citations and internal quotation marks omitted). Defendant presumably denies it was the cause of any injury or even that any injury

11

or breach occurred, but that is neither here nor there for purposes of standing or enforcement of the contract at this preliminary stage of the litigation.

Contrary to Defendant's assertions, the 2023 transaction-related documents attached as Exhibits F and G to the Complaint do not inherently contradict Plaintiff's allegations or plead itself out of court. Plaintiff cites these exhibits in the Complaint primarily to support its allegations that Defendant made representations, warranties and certifications upon which Plaintiff relied. DE 1 at ¶¶ 12, 26, 29, 31, 33-35, 46-48, 51, 63, 78. But the Complaint does not represent that these exhibits form the entire evidentiary basis of Plaintiff's contractual rights. And Plaintiff is not required to support each of its allegations with documentary evidence. A plaintiff is generally under no obligation to even attach a contract to their complaint when asserting a breach of contract claim, so long as the elements of the claim itself are sufficiently pled. *E.g.*, *Arnold v. Janssen Pharmaceutica, Inc.,* 215 F.Supp.2d 951, 962 (N.D.Ill. 2002) ("[F]ederal courts, unlike Illinois state courts, do not require that critical documents be attached to the complaint."). So, Defendant's argument that Plaintiff must make an "*evidentiary* showing that the Master Lease was ever assigned to Amergin Rail," DE 29 (Reply Br.) at 2 (emphasis in original), is misplaced. The time for evidentiary proof will come at summary judgment or trial.

Admittedly, the 2023 transaction-related documents are dense and contain a multitude of defined terms, redactions, and cross-references which make them difficult to fully decipher. But that is a reality of almost any modern commercial transaction between sophisticated parties. And it would be premature for the Court

to make a legal determination as to the full contractual rights of the parties prior to discovery, during which additional documents and evidence will presumably fill in the gaps and provide additional context. For now, the gestalt of the transaction documents, combined with Plaintiff's allegations, sufficiently establish a plausible claim that Amergin Rail is a party to the lease, as lessor, and that Indiana Harbor, as lessee, owed it certain obligations as of August 1, 2023. Defendant's argument unnecessarily confuses the issues at this stage.

## III. Whether Plaintiff's Tort Claims Are Barred by the Economic Loss Doctrine

Defendant's next argument is that the economic loss doctrine, as applied under Illinois law[3], bars Plaintiff's intentional misrepresentation and conversion tort claims because any duties owed by Indiana Harbor stemmed solely from its contractual obligations under the lease and its amendments. "Known as the *Moorman* doctrine in Illinois, [the economic loss] doctrine bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012) (citing *Moorman Manufacturing Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 448–49 (Ill. 1982)).

There are a number of exceptions to the *Moorman* doctrine, each rooted in the general rule that "[w]here a duty arises outside of the contract, the economic loss

---

[3] The parties respectively equivocate and hedge regarding choice-of-law issues, reserving their right to later challenge it. *See* DE 13 at 6, n.3 *and* DE 26 at 20, n. 20. But because both parties both rely on Illinois law and neither has identified a conflict or other source of law to compare, the Court will likewise assume that Illinois law applies. At summary judgment, the parties should expect to brief this issue in more detail in the event either contends a conflict-of-law analysis is necessary.

doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Wigod*, 673 F. 3d at 567 (quoting *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.,* 636 N.E.2d 503, 514 (Ill. 1994)). "To determine whether the *Moorman* doctrine bars tort claims, the key question is whether the defendant's duty arose by operation of contract or existed independent of the contract." *Id.* (citation omitted). "If, for example, an architect bungles a construction design, the *Moorman* doctrine bars the aggrieved owner's suit for negligence. The shoddy workmanship is a breach of the design contract rather than a failure to observe some independent duty of care owed to the world at large." *Id.* at 567–68 (citations omitted). Illinois also recognizes an express exception to the *Moorman* doctrine "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.,* fraud." *Catalan v. GMAC Mortg. Co.,* 629 F.3d 676, 693 (7th Cir. 2011) (quoting *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.,* 843 N.E.2d 327, 333 (Ill. 2006)).

Regarding Plaintiff's claim for intentional misrepresentation, Plaintiff clarifies that its claim is premised on "the false statements/certifications that Defendant made … *before* Plaintiff" owned the railcars and before Defendant had any contractual duties to Plaintiff. DE 26 at 16-17 (emphasis in original). In effect, Plaintiff characterizes its claim as one for fraudulent inducement, i.e., alleging misrepresentations that were designed to induce it into entering a contract to purchase the railcars. *Id.* at 18 ("Here, the misrepresentation is not Defendant's failure to pay Plaintiff, or properly use and maintain the [railcars], but rather false

certifications regarding the [railcar's] condition upon which Plaintiff relied to purchase [them]."). Defendant's own cited authority recognizes that claims for intentional misrepresentation fall outside the scope of the *Moorman* doctrine. *E.g.*, *Meadoworks, LLC v. Linear Mold & Eng'g, LLC*, 2020 WL 4194211, at \*4 (N.D. Ill. July 21, 2020), *adhered to on denial of reconsideration*, 2020 WL 5365977 (N.D. Ill. Sept. 8, 2020) ("There is no intentional false representation alleged in this case, as is the distinguishing factor from this case's allegations and those of fraud and deceptive business practices in [other cases]"). That is the situation here as Plaintiff alleges that the duty not to defraud arose before Defendant owed any contractual duty to Plaintiff, i.e., before the transaction closed. The *Moorman* doctrine therefore does not bar Plaintiff's claim for intentional misrepresentation.

Turning to Plaintiff's conversion claim, the elements are: "(1) a right to the property; (2) an absolute unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) the defendant's wrongful and unauthorized assumption of control, dominion, or ownership over the property." *Meadoworks*, 2020 WL 4194211, at \*3 (citing *Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005)). Contrary to the intentional misrepresentation claim, Plaintiff alleges that its rights with respect to the conversion claim stem solely from the contracts at issue, i.e., the sale and assignment of the lease. DE 1 ¶¶ 93. 94.

Plaintiff attempts to overcome the economic loss doctrine by confining its conversion claim only to the four "scrapped" railcars which it says Defendant

converted without authority. But this limitation does nothing to address the fact that Plaintiff claims that the source of its rights over the property (and in turn, Defendant's obligations as to all of the railcars) arose from the terms of the contract. Defendant possessed the railcars solely as a result of the lease, and its obligations as to how the railcars were to be used were governed solely by the lease. Thus, Plaintiff's recovery as to those four railcars must be limited to the contractual remedies available to it, not any additional tort remedy.

Defendant's cited authority here is directly on point and shows that where the parties' obligations are controlled by the terms of a written contract, conversion claims for breaches of the same obligations are barred by the economic loss doctrine. *AIT Worldwide Logistics, Inc. v. Pac. Coast Container, Inc.*, 2024 WL 4041323, at *6 (N.D. Ill. Sept. 4, 2024) (finding that conversion "claims may not proceed where the duty to the plaintiff arises from the contract"); *ACW Flex Pack LLC v. Wrobel*, 2023 WL 4762596, at *15 (N.D. Ill. July 26, 2023) ("In sum, the *Moorman* doctrine applies to the conversion claims because the underlying duties stemmed from the contractual relationships between [Plainitff] and the [Defendant]."); *Meadoworks*, 2020 WL 4194211, at *3 (similar). And while Plaintiff is correct as a general matter that there is "a common-law duty not to convert another's property," where a contract sets out more specific duties, the economic loss doctrine still bars the claim, "even though recovery in tort would otherwise be available under the common law." *AIT Worldwide*, 2024 WL 4041323, at *6 (citing *R.J. O'Brien & Assocs., Inc. v. Forman*, 298 F.3d 653, 657 (7th Cir. 2002)).

Plaintiff's Illinois state law case citation is unpersuasive on this point. *Loman v. Freeman* concerned a conversion claim within the context of a veterinarian who performed surgery on a horse beyond what was contemplated under the parties' agreement. 874 N.E.2d 542, 550 (Ill. App. Ct. 2006) ("Although the parties in this case explicitly agreed that defendant would refrain from operating on the right stifle, defendant's duty to refrain from doing so did not arise exclusively from the service contract. The parties' agreement in this respect was nothing more than an acknowledgment of defendant's preexisting common-law duty to refrain from altering the horse in any manner except as authorized by plaintiffs."). That strikes the Court as distinct from the situation here, where Defendant's entire relationship and obligations as to the leased railcars was governed by the contract between the parties. Furthermore, *Loman* concerned the economic loss doctrine within the context professional services, which Plaintiff elsewhere argues is irrelevant to its dispute with Defendant, which relates to use of railcars. *See* DE 26 at 14 ("Aside from arising in the factually immaterial context of professional services, unlike in *Kurtz*, the operative facts for the Breach of Contract claim are different from those that support Plaintiff's Equitable Estoppel claim."). Plaintiff cannot have it both ways. Even when only limited to the four scrapped railcars, under the terms of the contract alleged, Indiana Harbor had a duty to return the railcars to the owner at the conclusion of the lease. If four of the cars were not returned, then Plaintiff's recovery is pursuant to the terms of the contract, and the conversion claim is barred under the economic loss doctrine. Plaintiff's recovery for the allegedly scrapped railcars would be for their

replacement cost, something specifically noted as a basis to apply the economic loss doctrine. *Moorman*, 91 Ill.2d at 81. Accordingly, Defendant's motion as to Count VI, for conversion of the scrapped cars, will be granted.

## IV.    Whether Plaintiff's Claims for Unjust Enrichment, Equitable Estoppel, and UCC Violations State Claims Under Illinois Law

### A.  Unjust Enrichment

Plaintiff has asserted a claim for unjust enrichment on top of its claim for breach of contract. Defendant argues, however, that this claim must be dismissed because under Illinois law a party cannot seek unjust enrichment when there is a contract claim. Plaintiff responds that it has pled unjust enrichment only in the alternative to its primary breach of contract claim and that this is permissible under the Federal Rules of Civil Procedure.

The Court begins by noting that Defendant is correct that under Illinois law, Plaintiff cannot recover under both a breach of contract *and* unjust enrichment theory. *See Nesby v. Country Mut Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) ("Where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."); *Keck Garrett & Assocs., Inc. v. Nextel Comms., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Illinois law does not permit a party to recover on a theory of quasi-contract when an actual contract governs the parties' relations on that issue."). But as Plaintiff convincingly responds, its unjust enrichment claim is marked as being pled in the alternative, DE 1 at 21. Rule 8(d) of the Federal Rules of Civil Procedure expressly allow a party to plead alternative claims even if they are inconsistent with one another. Fed. R. Civ. P. 8(d)(3) ("A party

18

may state as many separate claims or defenses as it has, regardless of consistency."). And while Plaintiff's rote restatement of its other allegations in its unjust enrichment claim may have created some confusion (as it therefore realleges that the parties had an express contract), the Court must construe the pleadings "so as to do justice" as opposed to focusing on technical defects in the pleadings. Fed. R. Civ. P. 8(e).

If a valid contract exists, then Plaintiff will not be entitled to recover under an unjust enrichment theory, the contract and its terms will control. *E.g.*, *AIT Worldwide Logistics*, 2024 WL 4041323, at *7 (allowing alternative pleading but noting that unjust enrichment is "only available if no contract governs the parties' relationship") (citing *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 672 (7th Cir. 2023)).  But if no valid contract exists (which cannot be determined until summary judgment) and Plaintiff otherwise satisfies the elements of unjust enrichment claim, that avenue of recovery would be available. At this point, it is simply too early to tell which will be the case. So Defendant's motion to dismiss Count III, for unjust enrichment in the alternative to breach of contract, will be denied.

**B. Breach of Statutory Duties Under the UCC**

Defendant next attacks Count V which Plaintiff's complaint labels as "Breach of Statutory Duties Imposed under Article 2A of the Uniform Commercial Code." DE 1 at 24. Defendant argues this is no claim at all and that the UCC provisions cited "simply establish the remedial framework available to a lessor upon a lessee's default," not any independent claim or cause of action for violating a statute. DE 13 at 12. Plaintiff responds to this argument by directing the Court to out-of-circuit

19

district court cases which "have recognized that statutory claims under UCC can coexist with breach of contract claims." DE 26 at 20. Plaintiff's argument, and the cases cited to make it, fail to persuade the Court that this is a viable legal claim.

All of the UCC provisions cited in Plaintiff's complaint go to remedies available to a lessor upon default by a lessee. *See* DE 1 at ¶¶ 84-91. None of them establish any additional duty imposed on Defendant as lessee. Nor do *AAF-McQuay, Inc. v. MJC, Inc.,* 2002 WL 172442 (W.D. Va. Jan. 10, 2002) or *GATX Corp. v. Ga. Power Co.,* 674 F. Supp. 3d 1322 (N.D. Ga. 2023) hold as much. In *AAF-McQuay*, the issue was whether common law breach of contract or the UCC as adopted by Virginia for the sale of goods applied to the parties' dispute. *See* 2002 WL 172442, at *5 ("Accordingly, the court finds that the transactions at issue in this case were for goods, and as such, that the Virginia UCC applies."); *id.* ("With the defendant's contractual law grounds for summary judgment moot…"). Here there is no such dispute as to whether the UCC on the sale of goods applies. And in *GATX Corp.*, the court specifically recognized that the plaintiff's sole claim was for breach of contract. The question before the court, which it declined to answer until "closer to trial after additional briefing by the parties," was whether the plaintiff could recover damages under New York common law *and* the UCC. *Id.* at 1355. Again, that is question of available remedies, not a cause of action or claim in and of itself. In other words, neither case stands for the proposition that Section 2A of the UCC creates a separate cause of action under Illinois law. Accordingly, Defendant's motion to dismiss as to Count V,

for breach of statutory duties, will be granted. If Plaintiff wishes to plead these UCC provisions as potential remedies, it may do so in an amended complaint.

### C. Equitable Estoppel

Similar to the UCC claim, Defendant argues that Plaintiff's Count II for "Equitable Estoppel Arising Out of the Estoppel Certificate Within the Notice and Acknowledgment of Assignment," is not a claim upon which relief can be granted. Defendant cites to Illinois case law and legal treatises which state that equitable estoppel, unlike promissory estoppel, is not a cause of action but merely an affirmative defense. DE 13 at 12-13. In *Newtown Tractor Sales, Inc. v. Kubota Tractor Corp.*, the Illinois Supreme Court stated that "promissory estoppel has specifically been distinguished from equitable estoppel because the latter is available only as a defense, while promissory estoppel can be used as the basis of a cause of action for damages." 906 N.E.2d 520, 526 (Ill. 2009).

Plaintiff responds that while that may be true as a general statement, two subsequent unpublished decisions from the Illinois intermediate appellate courts breathe life into its novel application of equitable estoppel. Plaintiff relies primarily on *Friedman & Friedman, Ltd. v. Basic*, in which the court stated that it "has also held that equitable estoppel can be an independent cause of action, under the same theory as promissory estoppel." 2012 IL App (1st) 11-2642U, ¶ 21, 2012 WL 6962866, at *4 (Ill. App. Ct. 1st Nov. 30, 2012). Plaintiff then cites *Bear Valley Partners v. McDonald's Corp.*, where the court said in passing that the statute of limitations barred "claims of equitable estoppel which, although typically raised as an

affirmative defense, may also be raised as a freestanding cause of action, similar to promissory estoppel." 2024 IL App (2d) 230245-U, ¶ 73, 2024 WL 2941338, at *15 (Ill. App. Ct. 2nd Jun. 11, 2024).

Neither case sufficiently persuades the Court that equitable estoppel is a standalone claim or cause of action under Illinois law. First, both of Plaintiff's cited authorities are unpublished and thus under Illinois Supreme Court Rule 23(e), *Friedman & Friedman* has no precedential value and *Bear Valley Partners* may be cited only as "persuasive." Ill. S. Ct. R. 23(e) (2021). In other words, neither is controlling. Second, neither case is persuasive as they do not directly confront or distinguish the controlling Illinois Supreme Court precedent to the contrary (and do not appear to have been presented with argument as to why equitable estoppel is not a cause of action). Third, what is controlling on this Court and all other courts applying Illinois law are the published opinions of the Illinois Supreme Court. And as Defendant correctly notes, *Newtown Tractor Sales* by its express terms says that equitable estoppel "is available only as a defense" not a cause of action. 906 N.E.2d at 526. Subsequent case law from the Illinois Supreme Court reiterates this point. *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 780 n.11 (Ill. 2016) ("Promissory estoppel is distinguished from equitable estoppel in that the former allows a party to pursue a claim for damages based on breach of a gratuitous promise of future conduct, and the latter is used as a defense to preclude a party from denying a representation of past or existing fact."). Fourth and finally, as Defendant notes throughout its briefing, this clearcut rule has been followed by the majority of federal district courts

22

applying Illinois law on this issue. *E.g.*, *Telebrands Corp. v. My Pillow, Inc.*, 2021 WL 4147695, at \*2 (N.D. Ill. Sept. 13, 2021) ("[T]he more recent caselaw holding that equitable estoppel is an affirmative defense that prevents a party from asserting a particular claim, not a cause of action, is more persuasive.") (collecting cases); *see also Healy v. Moderne Cap., LLC*, 2020 WL 4464702, at \*2 (N.D. Ill. Aug. 4, 2020) (noting that authority cited "does not suggest that equitable estoppel is an independent cause of action"); *Carcharadon, LLC v. Ascend Robotics, LLC*, 2022 WL 3908585, at \*14 (N.D. Ill. Aug. 29, 2022) (similar). The Court joins those decisions, rather than striking new ground based on questionable and unpublished authority. Defendant's motion as to Count II, for equitable estoppel, will be granted.

## V. Whether Plaintiff's Fraud Allegations Satisfy Rule 9(b)'s Heightened Pleading Standard

Defendant's final argument relates to Plaintiff's claim for intentional misrepresentation. Defendant challenges this claim on another ground beyond the *Moorman* doctrine, discussed above. Defendant asserts that Plaintiff fails to satisfy Rule 9(b)'s heightened pleading standard that applies to any claim that sounds in fraud, such as one for intentional misrepresentation.

The elements of the claim under Illinois law are: (1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance. *Dloogatch v. Brincat,* 920 N.E.2d 1161, 1166 (Ill. Ct. App. 2009). Under the heightened federal pleading standard of Rule 9(b) of the Federal Rules of Civil

Procedure, a plaintiff "alleging fraud . . . must state with particularity the circumstances constituting fraud." *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007) ("This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do.") (internal quotation marks omitted). The Seventh Circuit has summarized these requirements "as calling for the first paragraph of any newspaper story: "'the who, what, when, where, and how'" of the fraud. *Wigod*, 673 F.3d at 569.[4] Plaintiff clears that threshold. It identifies that Indiana Harbor made false statements when it signed the pre-closing certification regarding the condition and use of the railcars that Amergin Rail eventually purchased and alleges that were contrary to the railcars actual condition and use. With that spelled out, all that remains is whether Plaintiff has sufficiently alleged reasonable reliance on those statements.

The certification at issue states that "Buyer" would rely on those representations and Plaintiff alleges as much throughout its complaint. *See* DE 1 at ¶¶ 46, 50, 51, 77. And that is where Defendant focuses its argument because, as discussed above, the "Buyer" listed in the certifications was Amergin Asset Management Services LLC, but the eventual actual buyer was Plaintiff Amergin Rail. But the fact that the LLC is listed as "Buyer" on the Notice differs is not dispositive at the pleading stage. Perhaps corporate separateness (or in this case LLC separateness) may impact this analysis later at summary judgment if Defendant can

---

[4] Absent from this formulation is any explanation of "why," as Rule 9(b) specific notes states that "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

24

show no one affiliated with Plaintiff relied on the notice, but it does not on its own defeat Plaintiff's claim under the liberal pleading standards allowed by the Federal Rules of Civil Procedure. So too with Defendant's argument that its statements about the condition of the railcars in June 2023 could not be false because Plaintiffs did not realize that to be the case until after the transaction closed and the lease expired. *See* DE 13 at 20 ("Plaintiff seeks to recover on the supposedly 'false' representation that the decades old railcars were being used in accordance with the Lease. Plaintiff apparently infers this based on the railcars' condition *after* the Lease ended, therefore concluding that the railcars must not have been used as intended."). That's a question of fact that cannot be resolved now.

Plaintiff sufficiently pleads that it relied on the statements in Defendant's certification regarding the condition of railcars and that these statements were false when it purchased the railcars. Whether that reliance was in fact reasonable and the relevance of which entity is listed on which documents and who may have read them is a question for another day. *See, e.g.*, *Graves v. Man Grp. USA, Inc.*, 479 F. Supp.2d 853 (N.D. Ill. 2007) ("A motion to dismiss tests the sufficiency of a complaint, not the merits of a case."). Defendant's motion to dismiss for failure to plead fraud with particularity in accordance with Rule 9(b) will be denied.

### Conclusion

For the reasons discussed, the Court Defendant's Motion to Dismiss [DE 12] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Count II (Equitable Estoppel), Count V (UCC Art. 2A), and Count VI (Conversion) are **DISMISSED**

25

**WITHOUT PREJUDICE**. If Plaintiff wishes to file an amended complaint, it may do so by **July 14, 2026**. Regardless of whether Plaintiff files an amended complaint, as discussed *supra* in footnote 2, Plaintiff is **ORDERED** to file a revised Fed. R. Civ. P. 7.1 Corporate Disclosure statement listing the complete membership of Plaintiff and of **all** of Plaintiff's constituent members sufficient for the Court to be absolutely assured there is jurisdiction to decide this dispute given the potential ambiguities raised by Defendant in the declaration of Jerald Rosen [DE 26-1]. This must be filed by **July 7, 2026.**

So ORDERED this 30th day of June 2026.

*/s/ Abizer Zanzi*
MAGISTRATE JUDGE ABIZER ZANZI
UNITED STATES DISTRICT COURT